FILED
COURT OF APPEALS
DIVISION II

2015 MAY 27 AM 9: 32

STATE OF WASHINGTON

BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In re the Marriage of<br><br>BECKY C. DEVELLE,<br><br>               Appellant,<br><br>and<br><br>MARC G. DEVELLE,<br><br>               Respondent. | No. 44484-4-II<br>Consolidated with No. 44614-6-II<br><br><br><br><br>UNPUBLISHED OPINION |

JOHANSON, C.J. — Becky Develle appeals several superior court orders entered in connection with the dissolution of her marriage to her former husband, Marc Develle. We hold that the parties' settlement agreement was valid, the trial court properly relied on the parties' agreement regarding spousal maintenance, the trial court properly amended the parenting plan, and the trial court lawfully found Becky[1] in contempt. In addition, the trial court did not err by ordering the Develle children to attend public school. Accordingly, we affirm.

---

[1] We refer to Becky and Marc by their first names for clarity, intending no disrespect.

## FACTS

Marc and Becky were married in June 1986. Becky filed for legal separation in March 2011. Marc and Becky had eight children together, five of whom were dependents at the time of trial. Throughout the marriage, Becky was a homemaker who also homeschooled the children.

Dr. Landon Poppleton, a clinical psychologist, conducted a custody evaluation for the Develle family. The efficacy of Becky's teaching methods were central to the resolution of the parenting plan. Dr. Poppleton found that, notwithstanding intelligence quotients in the normal ranges, each of the children scored unacceptably low in various domains of their academic achievement. Citing complaints from the children, Dr. Poppleton noted serious concerns regarding Becky's ability to provide a healthy, supportive home routine including adequate nutrition. Dr. Poppleton also had concerns about Becky's live-in boyfriend's son (D.J.) who had propositioned one of Becky's young daughters for sex.

The trial court appointed Erin Wasley as guardian ad litem to serve as a liaison between the court and the Develle children. Wasley's subsequent investigations corroborated many of Dr. Poppleton's concerns.

The parties proceeded to trial in August 2012. On the second day of trial, the parties announced on the record that they had reached "a global agreement on all of the issues at this time." 2 Report of Proceedings (RP) at 35. The parties agreed that the two youngest children, H.D. and B.D., would remain primarily with Becky while Marc would retain custody over the remaining three dependent children. The trial court adopted the parties' agreement including a review hearing 45 days after entry of the order to determine whether the parenting schedule proved successful for the family and also to reexamine the custody arrangement if necessary. The

2

agreement provided that Marc would pay Becky $1,000 per month in child support, but the trial court made it clear that this amount was subject to review at a later date.

The agreement further specified that Marc had sole decision-making rights relating to the children's education and that Becky could no longer homeschool the children. Moreover, the parties agreed that D.J. would not have unsupervised contact with H.D. or B.D.

The parties agreed that Marc would receive the family home. The trial court ordered Becky to vacate the home and to leave it in a clean and habitable condition. The trial court permitted Becky to take some of the personal property from the home provided she made a list of those items and left the children's possessions there. The court specifically warned Becky not to leave the home empty of furnishings.

The trial court discussed each agreement provision, asking Becky and Marc separately whether they agreed. Becky answered in the affirmative to each question, including the maintenance and child support issue (with the associated review period) as well as the custody arrangement. Becky also answered affirmatively when the trial court asked her whether she "firmly believed" that she and Marc had an agreement. 2 RP at 60. The terms of the agreement were accurately memorialized in a decree of dissolution, parenting plan, and order of child support.

The trial court instructed Wasley to monitor the children's progress to determine whether the parenting schedule and custody arrangement was working for the family. Before the first review hearing, Marc filed a motion for contempt based in part on reports that there had been a second incident involving D.J. making inappropriate sexual remarks to H.D. Marc alleged that Becky continued to fail to protect H.D. from D.J. contrary to the court's previous order. Marc also

3

complained that the home was in disarray when Becky left and that she took the children's personal property.

The trial court set these matters over for a review hearing the following week. There, informed initially by Wasley's report, the trial court heard testimony from Becky regarding her efforts to supervise her children around D.J. amidst allegations that there had been further unseemly conduct. Becky conceded that she had left H.D. alone with D.J. for a short time on one occasion. Becky also admitted that she allowed B.D. and D.J. to sleep in the same bedroom, asserting ignorance as to that particular prohibition in the parenting plan.

The trial court awarded temporary custody of H.D. and B.D. to Marc pending an evidentiary hearing. Wasley testified at the evidentiary hearing and recommended that Becky be denied overnight visits from that point forward. Wasley's recommendation was based on her ongoing investigation and her interviews with the Develle children. Wasley noted that Becky actively minimized the risk D.J. posed and that the children strongly preferred the current schedule with Marc as the primary parent. Wasley also doubted whether Becky was willing to enforce the court's restrictions.

The trial court examined the factors contained in RCW 26.09.187(3) and concluded that Marc was best suited for primary custody of all the dependent children. The court expressed several concerns, not the least of which was its uncertainty that Becky could provide a loving, stable, and consistent relationship with each of the children. The trial court also noted that, in its view, Becky had overlooked the emotional and developmental needs of the children and that, unlike Marc's home, there were allegations of recent emotional and physical abuse in Becky's home. The court awarded primary custody to Marc on a permanent basis.

4

Becky moved for reconsideration, claiming that the children had been coached to lie. The court denied Becky's motion, ruling that she had not established her burden under either CR 59 or CR 60. The trial court then found Becky in contempt for failing to leave the family home in a clean and habitable condition and because she defied the same order by taking the vast majority of the parties' personal property, including the children's personal property. The trial court allowed her to purge the contempt finding by returning specific items belonging to the children. Becky appeals.

## ANALYSIS

### I. VALID SETTLEMENT AGREEMENT

Becky argues that the parties' settlement agreement was invalid because (1) she agreed under duress, (2) the agreement is void for vagueness, and (3) the agreement creates an illusory contract. We hold that these claims fail.

### A. DURESS

A party asserting duress must produce evidence that the other party's wrongful or oppressive conduct deprived her of her free will at the time she entered into the agreement. *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944-45, 640 P.2d 1051 (1982). But Becky alleges no duress caused directly by Marc. Instead, she claims that she felt coerced to agree to the settlement because her attorney told her off the record that the court was displeased with her for continuing to run homeschool classes. But as Becky acknowledges, there is no proof of such a conversation, and even assuming the truth of her allegation, it would not establish that Becky agreed under duress because animosity alone does not constitute wrongful

5

or oppressive conduct sufficient to deprive Becky of her free will.[2] *Retail Clerks*, 96 Wn.2d at 944-45.

After the parties finalized the terms of their agreement, the trial court discussed each provision, asking Becky and Marc separately whether they agreed. Becky answered in the affirmative to each question, including the maintenance and child support issue, with the associated review period, as well as the custody arrangement. Becky answered affirmatively when the trial court asked her whether she "firmly believed" that she and Marc had an agreement. 2 RP at 60. In light of these facts, Becky's claim of duress must fail.

## B. VAGUENESS

Becky's void-for-vagueness claims also fail because she misapprehends the nature of such a challenge. A void-for-vagueness claim involves legislation that either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to its application. *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 612, 192 P.3d 306 (2008). Here, Becky's argument relates to a provision in a marriage settlement agreement and she cites to no authority that the void-for-vagueness doctrine applies here.[3] We reject this claim.

---

[2] Becky also argues that she agreed in part due to fear of losing her children. But her fear does not prove duress because her fear is not the product of a wrongful act of another.

[3] Becky also argues that the trial judge violated the appearance of fairness doctrine and one or more of the codes of judicial conduct. But what she cites as examples of alleged misconduct or bias are run-of-the-mill rulings or credibility determinations that are not favorable to her. This argument lacks merit.

## C. ILLUSORY CONTRACT

Becky's contention that the settlement agreement constitutes an illusory contract is equally unavailing. A contract is illusory when its provisions make performance optional or discretionary. *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 317, 103 P.3d 753 (2004). Here, the parties' settlement agreement was memorialized as a court order. Nothing in the agreement made performance optional or discretionary. Accordingly, the trial court properly enforced its provisions. Rejecting Becky's arguments, we hold that the settlement agreement was valid.

## II. SPOUSAL MAINTENANCE

Becky argues that she is entitled to maintenance because of the marriage's length and the disparity in income between herself and Marc. But because Becky agreed to forego spousal maintenance, there is no error.

We review a trial court's maintenance award for an abuse of discretion. *In re Marriage of Estes*, 84 Wn. App. 586, 593, 929 P.2d 500 (1997). The trial court abuses that discretion if it bases a denial of maintenance on untenable grounds or for untenable reasons. *In re Marriage of Foley*, 84 Wn. App. 839, 845, 930 P.2d 929 (1997).

Becky voluntarily agreed to forego an award of maintenance when she entered into the settlement agreement with the understanding that she would receive $1,000 in child support. At the time the parties reached their agreement, Becky had custody of the two younger children, H.D. and B.D. The agreement included an award of $1,000 monthly child support pending a review

hearing where Becky's employment efforts and the residential schedule would be considered.[4]
The following exchange occurred on the record:

> THE COURT: And do you agree on the child support number of 1,000, whether we call it maintenance or child support, it's a number that we're going to put in place today. It will not be fixed; that we'll continue to review that number *based upon the residential schedule of the children*?
> [BECKY]: Yes.
> . . . .
> THE COURT: And you firmly believe that we do have an agreement?
> [BECKY]: Yes.

2 RP at 59-60.

Later, Becky's attorney said that she "probably shouldn't have forfeited maintenance on a 25-year marriage. She did it with the thought that she was getting the 1,000 in child support." 3 RP at 119. The trial court's unchallenged findings of fact state that maintenance should not be ordered "[p]er the agreement of the parties." Clerk's Papers (CP) at 8. Furthermore, the agreed decree of dissolution states that maintenance "[d]oes not apply." CP at 17.

Becky agreed to forego maintenance in lieu of a variable child support award. We hold that the trial court did not abuse its discretion by entering orders consistent with the parties' agreement.

### III. PARENTING PLAN

Becky appeals the trial court's adjustment to the parenting plan contending that the court erred by altering the custody arrangement without following the parenting plan modification

---

[4] On the record before us, there is no review hearing specifically regarding Becky's employment status.

8

statute. We hold that the trial court properly reserved a final decision on the residential schedule and adjusted, rather than modified, the parenting plan.

Generally, we review a trial court's rulings about the provisions of a parenting plan for abuse of discretion. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997). Similarly, a trial court exercises its discretion in ruling on a motion for reconsideration and this court will only overturn such a ruling for an abuse of discretion. *Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 685, 41 P.3d 1175 (2002).

Under the Parenting Act of 1987, ch. 26.09 RCW, the best interests of the child continues to be the standard by which the trial court determines and allocates parenting responsibilities. RCW 26.09.002; *In re Marriage of Possinger*, 105 Wn. App. 326, 335, 19 P.3d 1109, *review denied*, 145 Wn.2d 1008 (2001). Accordingly, our courts have held that

> the trial court is not precluded by the Parenting Act from exercising its traditional equitable power derived from common law to defer permanent decisionmaking with respect to parenting issues for a specified period of time following entry of the decree of dissolution of marriage.[5]

*Possinger*, 105 Wn. App. at 336-37.

Here, the trial court accepted the parties' settlement agreement that conditioned a joint custody arrangement on its ability to pass muster under two scheduled review periods. The nature of the review was to "detail if the parenting schedule is working for the children and the family, including a review of custody if necessary." CP at 27. Upon review, the trial court determined that the arrangement was not functioning in the best interests of the children, so it applied the

---

[5] Our Supreme Court has endorsed the reasoning in *Possinger*, but it has declined to do so when the period for review is completely open ended. *See In re Parentage of C.M.F*, 179 Wn.2d 411, 427, 314 P.3d 1109 (2013).

9

standards in RCW 26.09.187(3) and altered the parenting plan accordingly. Thus, we conclude that Becky's claim that the court failed to follow the procedures necessary to modify a parenting plan fails.[6] We hold that the trial court did not abuse its discretion by denying Becky's motion for reconsideration.

## IV. CONTEMPT

Becky argues that the trial court unlawfully found her in contempt, in part by failing to afford her the constitutional safeguards extended to criminal defendants. Because the court found Becky in civil contempt and included an opportunity to purge the contempt finding, Becky is not entitled to the constitutional safeguards extended to criminal contempt defendants. Accordingly, we hold that Becky's claim fails.

Contempt can either be civil or criminal with the latter requiring the constitutional safeguards extended to other criminal defendants. *In re Marriage of Didier*, 134 Wn. App. 490, 500, 140 P.3d 607 (2006), *review denied*, 160 Wn.2d 1012 (2007). Our current statutes distinguish between punitive and remedial sanctions for contempt. RCW 7.21.010, .030, .040. A "punitive sanction" is "a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court." RCW 7.21.010(2). A "remedial sanction" is "a sanction imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(3).

---

[6] Becky also disputes the trial court's conclusions regarding several factors our courts are required to consider under RCW 26.09.187(3). Despite Becky's claims that these factors weigh in her favor, the trial court considered each of them thoroughly on the record and came to a different conclusion. Becky makes additional policy-based arguments that children should be with their mothers generally. The trial court's findings are supported by the record and the court did not abuse its discretion.

10

A court has civil contempt power in order to coerce a party to comply with its lawful order or judgment. RCW 7.21.020. "Contempt of court" includes an intentional "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b). "'An order of remedial civil contempt must contain a purge clause under which a contemnor has the ability to avoid a finding of contempt and/or incarceration for non-compliance.'" *In re Interest of Rebecca K.*, 101 Wn. App. 309, 314, 2 P.3d 501 (2000) (quoting *State ex rel. Shafer v. Bloomer*, 94 Wn. App. 246, 253, 973 P.2d 1062 (1999)).

Here, the trial court found Becky in contempt based on her disregard of the court's order to leave the family home in a clean, habitable manner and on her decision to take a significant amount of personal property from the home contrary to the court's instruction. Marc requested she return the children's musical instruments and copies of the family photos. The trial court explained to Becky that she could purge the finding of contempt and avoid further civil penalty by returning the requested items before a court-imposed deadline.

Accordingly, each of Becky's arguments are unavailing because the nature of the trial court's order was remedial civil contempt. The sanction here was remedial because the trial court imposed it for the purpose of coercing performance that was yet in Becky's power to perform; that is, to return the items she had in her possession. Therefore, Becky is not entitled to the constitutional safeguards that would be available to a criminal defendant and her claims necessarily fail.

## V. COMPULSORY EDUCATION

Becky argues that the trial court's ruling restricted her right to raise her children according to her beliefs, that B.D. was "not under the court's jurisdiction," that she complied with all state

11

homeschooling laws, and that "[a] person cannot be found guilty of following a statute" without denial of due process. Br. of Appellant at 48-49. But Becky agreed that Marc would have sole control of every decision relating to the children's education and that she was no longer entitled to conduct homeschooling. Marc opted to enroll the children in public education. Because Becky agreed to allow Marc to make education decisions, we hold that no trial court error occurred.

## VI. ATTORNEY FEES

Marc requests attorney fees pursuant to RAP 18.1 and RAP 18.9. But Marc presents no legal authority to support his claim for attorney fees when he appeared pro se on appeal. In addition, although we do not find Becky's arguments persuasive, we also do not find her appeal to be frivolous. Therefore, we deny Marc's attorney fee request.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

WORSWICK, J.

MELNICK, J.

12